IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MR. GROCER, LLC        §

                                §   CIVIL ACTION NO._____

V.                          §

                                §

THE UNITED STATES OF AMERICA,   §

U.S. DEPARTMENT OF AGRICULTURE,   §

FOOD AND NUTRITION SERVICE      §

PLAINTIFF'S REQUEST FOR RESTRAINING ORDER

AND TEMPORARY INJUNCTION AND ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

      COMES NOW, MR. GROCER, LLC., hereinafter referred to as "Plaintiff" complaining of the U.S. Department of Agriculture, Food and Nutrition Service, hereinafter referred to as "Department of Agriculture and for same would respectfully show unto the Honorable Court as follows:

NATURE OF CASE

1.    Plaintiff Mr. Grocer LLC is a mobile retail grocer with its principal place of business being in Hearne, Texas.  Plaintiff does have routes in Dallas, Texas; Waco, Texas; Hearne, Texas, and several other rural central Texas locations.  Plaintiff's mobile business is a participant in the Supplemental Nutrition Assistance Program ("SNAP" or "Food Stamp Program").

2.    Defendant U. S. Department of Agriculture, Food and Nutrition Service ("Department of Agriculture") has permanently disqualified Plaintiff from participation in the Food Stamp Program for allegedly trafficking SNAP benefits. Plaintiff brings this action to stay pending the outcome of the trial, the actions of the Department of Agriculture in disallowing Plaintiff to participate in the SNAP program. Further, Plaintiff appeals through this trial de novo action to

set aside Defendant's determination to permanently disqualify Plaintiff from participation in the SNAP. Additionally, Plaintiff challenges the constitutionality and validity of methods utilized by Defendant in disqualifying Plaintiff from the SNAP program.

3.      Pursuant to 7 U.S.C. §2023(a)(15), this action is a trial de novo in which the Court shall determine the validity of the questioned administrative action at issue.

### Jurisdiction and Venue

4. This Court has subject matter jurisdiction over this controversy, pursuant to 7 U.S.C. §2023, 5 U.S.C. §793, the Fifth and Fourteenth Amendments of the United States Constitution and 7 CFR §279.7.

5. Venue is proper in this Court pursuant to 7 U.S.C. §2023 and 28 U.S.C. §1331. Venue is proper in this District pursuant to 7 U.S.C. §2023 and 28 U.S.C. §1391(e). Plaintiff had grocer routes within Dallas County, Texas located in the Northern District of Texas.

### Parties

6. Plaintiff is a mobile retail grocer with its principal office located at 204 N. Houston St., Hearne, Texas 77859.

7. Defendant United States may be served with process pursuant to 7 C.F.R. §2023 by sending summons and complaint to the United States Department of Agriculture's Houston Regional Office located at 1919 Smith Street, Room 1146, Houston, Texas 77002.

### Factual Background

8. Plaintiff began operation of its mobile grocer beginning in January, 2010. Plaintiff's business

was solely based upon sales to SNAP beneficiaries. **Plaintiff only took SNAP benefits** as compensation for the purchase of its products. Plaintiff did not take any cash money nor did Plaintiff charge credit cards. Plaintiff's income was solely based upon SNAP benefits it earned in sales.

9. Plaintiff began with 1 mobile grocer van and continued its growth process until it had acquired a total of 8 vans by June, 2011. With the acquisition of each new mobile grocer van, Plaintiff acquired drivers who were familiar with the territories in their route; had numerous years of experience in selling in the territories in their routes; and possessed a demonstrated, continuous pattern of strong sales in the territory.

10. In the beginning of January, 2011, Plaintiff's sales volume increased significantly with the acquisition of 6 of the top sales producing drivers from other companies coming to work for Plaintiff. These drivers possessed demonstrated histories of monthly sales of $40,000.00 to $45,000.00.

11. Plaintiff's sales volume grew exponentially. Its credit worthiness was well recognized by Dunn and Bradstreet. Any profits realized from the exponential growth of its sales volume was quickly absorbed in the cost of expanding the business.

12. Plaintiff's small business employed approximately 25-27 employees.

13. Plaintiff received a letter of charges dated August 19, 2011 from Defendant alleging that Plaintiff was trafficking SNAP benefits. Defendant did not make any allegations that onsite visits were made to any of Plaintiff's mobile vans. Further, Defendant did not make any allegations that investigators witnessed Plaintiff purchasing SNAP benefits from its customers. Defendant's allegations were based solely upon a review of Plaintiff's sales numbers as

compared to its ALERT computer program.    Defendant alleged that its computer program revealed the following:

> 1 Two vouchers were issued on the same day for some SNAP beneficiaries that purchased groceries from Mr. Grocer.

> 2. The majority of the individual recipient that purchased from Mr. Grocer exhausted their benefits in unusually short periods of time.

> 3. Excessively large purchase transactions were made from Mr. Grocer by  recipient accounts.

Based solely upon this review of Plaintiff's sales numbers, Defendant reached a conclusion that Plaintiff was trafficking SNAP benefits.

14.    Plaintiff provided a written reply on September 12, 2011, subsequent to meeting with Rodney Brown of Defendant's Houston field office. Such written reply contained Plaintiff's emphatic denial that the company had trafficked SNAP benefits.    Additionally, Plaintiff provided copies of bank statements, which confirmed the purchase of supplies proportionate to its sales volume.  Supply invoices were also provided.

15.  On November 4, 2011, Defendant issued a final determination of permanent disqualification based upon an offense of trafficking, without the possibility for a civil penalty in lieu of permanent disqualification.

16. Plaintiff made a timely request for review of the adverse action listed above.

17. In an opinion issued on January 12, 2012, Douglas G. Perry, Administrative Review Officer for Defendant upheld the final determination of permanent disqualification, without the possibility for a civil penalty in lieu of permanent disqualification. Attached hereto as Exhibit A and incorporated herein by reference is a true and correct copy of the administrative decision.

## RESTRAINING ORDER AND TEMPORARY INJUNCTION

18.  Plaintiff re-alleges and incorporates herein all facts and allegations set forth above.

19. Pursuant to 7 U.S.C. 2023(17), Plaintiff is requesting that this Court stay the administrative actions of Defendant pending trial of this matter.  In support of such request, Plaintiff will show the following:

> 1) Plaintiff is likely to prevail in demonstrating the arbitrary and purely speculative assumption by Defendant that Plaintiff was trafficking SNAP benefits based solely upon a review of Plaintiff's sales numbers as compared to the ALERT computer program;

> 2) Plaintiff is likely to prevail in demonstrating the violation of its substantive due process rights, procedural due process rights, and equal protection rights under the law have been and continue to be violated by Defendant;

> 3) Plaintiff can show the irreparable harm to Plaintiff's company by demonstrating the effects of preventing it from doing business pending the trial of this matter will effectively close Plaintiff's business; damage its credit rating; dismantle its sales team; and financially ruin Plaintiff;

> 4) Plaintiff can show that it has exhausted all administrative remedies and has no adequate remedy at law to redress the grievances which have been set forth herein.

20.  Plaintiff can produce invoices to demonstrate that it restocked its mobile grocery vans on a regular basis, which would invalidate an allegation it purchased SNAP benefits.  Consistent restocking would support Plaintiff's position that food was exchanged for SNAP benefits rather than Plaintiff purchasing SNAP benefits from customers.

21.  Plaintiff's bank statements can be produced in order to demonstrate that Plaintiff's company, although growing at the time of the alleged offenses, basically existed with the use of

its credit. Plaintiff's company was "cash poor" at all times relative. Based upon such, it would have been unlikely that there was cash readily available to purchase SNAP benefits.

22. The owner of Plaintiff Company, as well as the employees of Plaintiff Company were dependent upon the proceeds from Plaintiff Company to sustain them financially and therefore none were independently wealthy enough to contribute the type money necessary to purchase SNAP benefits to the extent alleged by Defendant.

23. Plaintiff denies that it trafficked SNAP benefits. Plaintiff is prepared to demonstrate the flaws in the ALERT computer program. During the administrative process, Plaintiff did not have an opportunity to review the ALERT computer program. However, in the trial of this matter, Plaintiff will have the opportunity to examine the program and obtain expert witness testimony in order to meet its burden of proof that will show that reasonable minds would not conclude that trafficking occurred.

## APPEAL OF PERMANENT DISQUALIFICATION FROM SNAP PROGRAM

24. Plaintiff re-alleges and incorporates herein all facts and allegations set forth above.

25. In accordance with 7 U.S.C. §2023, Plaintiff hereby appeals its permanent disqualification as a participant in the SNAP program and requests a trial de novo in this Court. This Court is to determine the validity of the administrative action in question and, if such action is invalidated, the Court is requested to enter a judgment or order reflecting such. Plaintiff is requesting that the administrative action in question be set aside.

26. Plaintiff requests any and all other relief as the Court may deem proper.

Respectfully submitted.

**WILLIAM M. TOLES**

State Bar No. 00798550

**WRIGHT & TOLES**
9330 LBJ Freeway, Suite 1400
Dallas, Texas 75243
Tel:  (972) 231-6001
Fax: (972) 231-9150

**ATTORNEY FOR PLAINTIFF**

# EXHIBIT A

**United States Department of Agriculture**



**Food and Nutrition Service**

**Benefit Redemption Division**

**Administrative Review Branch**

227 N. Bronough St. Rm 3086 Tallahassee,FL 32301

(850)942-8315 Ext. 16

Fax: (850) 942-8320

Doug.Perry @fns.usda.gov

January 12, 2012

William M. Toles, Attorney
Abrams Centre
9330 LBJ Freeway STE 1400
Dallas, Texas  75243

Re:    Mr. Grocery's
          204 North Houston Street
          Hearne, Texas  77859-2371

Dear Counselor:

Enclosed is the Final Agency Decision of the U.S. Department of Agriculture (USDA), Food and Nutrition Service (FNS) in response to the request for administrative review received on November 29, 2011.  Also included therein is a statement regarding your rights to a judicial review.

It is the decision of the USDA that there is sufficient evidence to support a finding that a permanent disqualification from participating as an authorized retailer in the Supplemental Nutrition Assistant Program was properly imposed against Mr. Grocery's by the Southwest Region Retailer Compliance Center.

Sincerely,

DOUGLAS G. PERRY
Administrative Review Officer

Enclosure

**U.S. Department of Agriculture**
**Food and Nutrition Service**
**Administrative Review**
**Tallahassee, FL 32301**

| | | |
|---|---|---|
| Mr. Grocery's, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | **Case Number: C0141387** |
| | ) | |
| Southwest Region Retailer | ) | |
| Compliance Center, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

## FINAL AGENCY DECISION

It is the decision of the USDA that the record indicates that Mr. Grocery's committed violations of the Supplemental Nutrition Assistant Program ("SNAP"), and that there is sufficient evidence to support a finding that the permanent disqualification from participation as an authorized retailer in the program, as initially imposed by the Southwest Region Retailer Compliance Center (hereinafter "Compliance Center") was appropriate.

## ISSUE

The issue accepted for review is whether the Compliance Center took appropriate action, consistent with 7 CFR § 278.6(a) and (e)(1) in its administration of the SNAP, when it assessed a permanent disqualification against Mr. Grocery's on November 4, 2011.

## AUTHORITY

7 U.S.C. § 2023 and its' implementing regulations at 7 C.F.R. § 279.1 provide that "[A] food retailer or wholesale food concern aggrieved by administrative action under § 278.1, § 278.6 or § 278.7 . . . may file a written request for review of the administrative action with FNS."

## STATEMENT OF THE CASE

In a letter dated August 19, 2011, the Compliance Center informed Appellant that they were in violation of the terms and conditions of the SNAP regulations, 7 CFR §§270 – 282, based on EBT benefit transactions that "establish clear and repetitive patterns of unusual, irregular, and inexplicable SNAP activity for your type of firm."

The letter of charges states, in relevant part, that: "These violations warrant a permanent disqualification (Section 278.6(e) (1) (i)). Under certain conditions, FNS may impose a civil money penalty (CMP) in lieu of a permanent disqualification (Section 278.6(i))."

The Compliance Center documents in their record that they conducted an interview on September 9, 2011 with Appellant and his accountant. The following was noted as responses to the Charge letter dated August 19, 2011 as summarized:

- The transaction are simply the result of customers' regular spending habits;
- In addition, a document from Selwyn Blanchard, CPA, dated July 21, 2011, titled "Accountant's Compilation Report" was presented to the Compliance Center. The submittal included following documents:
  1. An undated purchase invoice from Sam's Club in the amount of $7,660.49;
  2. Numerous photocopies of SNAP recipient signed manual vouchers;
  3. Assorted IRS tax documents for 2009 and 2010;
  4. Balance sheet through June 30, 2011;

- **Attachment 1**: Multiple withdrawals were made from an individual benefit account within unusually short time frames:
  Based on the transactions noted in this Attachment, it appears the times reflected are not the purchase times. Instead these dates and times are actually when the Offline SNAP Vouchers are cleared through the authorization system for payment. However, all vouchers written for that day are cleared and processed at the end of each day;

- **Attachment 2**: The majority or all of the individual recipient benefits were exhausted in unusually short periods of time:
  No specific response was recorded for the transactions noted in this Attachment; and

- **Attachment 3**: Excessively large purchase transactions were made from recipient accounts:
  The transactions are not unusually excessive for large families.

After giving consideration to the Appellant's reply and evidence of the case, the Compliance Center notified Appellant in a letter dated November 4, 2011 that Mr. Grocery's was being permanently disqualified from participation in SNAP in accordance with 7 CFR §278.6(e)(1) for trafficking. The letter states, in relevant part, that: "These violations warrant a permanent disqualification (Section 278.6(e) (1)). Under certain conditions, FNS may impose a civil money penalty (CMP) in lieu of a permanent disqualification (Section 278.6(i))."

In a letter received on November 29, 2011, Appellant appealed the Compliance Center's assessment and requested an administrative review of this action. The appeal was granted. Subsequent correspondence was received from Appellant, through counsel, on January 9, 2012.

## ANALYSIS AND FINDINGS

In administrative proceedings involving disputes of regulatory actions or inactions, USDA assumes the responsibility of establishing a sufficient factual record to prove or disprove the allegations of the appeal. The record is then reviewed in light of the evidentiary standards and analytical frameworks established by various courts of law.

In appeals of adverse actions, an appellant bears the burden of proving by a preponderance of the evidence, that the administrative actions should be reversed. That means an appellant has the burden of providing relevant evidence which a reasonable mind, considering the record as a whole, might accept as sufficient to support a conclusion that the matter asserted is more likely to be true than not true.

### I

The controlling statute in this matter is contained in the Food & Nutrition Act of 2008, as amended, 7 U.S.C. § 2021 and 278 of Title 7 of the Code of Federal Regulations (CFR). Part 278.6(a) and (e) (1) (i) establish the authority upon which a permanent disqualification may be imposed against a retail food store or wholesale food concern in the event that personnel of the firm have engaged in trafficking SNAP benefits.

7 CFR §278.6(e) (1) reads, in part, "FNS shall disqualify a firm permanently if personnel of the firm have trafficked as defined in §271.2." Trafficking is defined, in part, in 7 CFR §271.2, as "the buying or selling of SNAP benefits for cash or consideration other than eligible food."

In addition, 7 CFR § 278.6(a) states, *inter alia*, FNS may disqualify any authorized retail food store … if the firm fails to comply with the Food and Nutrition Act of 2008, as amended, or this part. Such disqualification shall result from a finding of a violation on the basis of evidence that may include facts established through inconsistent redemption data, evidence obtained through a transaction report under an *electronic benefit transfer system* and on-site investigations …. (Emphasis added.)

### II

On review, charges were based on an analysis of SNAP electronic benefit transfer (EBT) transaction data during the 6-month period of February through July 2011. This involved three patterns of EBT transaction characteristics indicative of trafficking:

1. Multiple withdrawals were made from individual benefit accounts in unusually short time frames;
2. The majority or all of the individual recipient benefits were exhausted in unusually short periods of time; and
3. Excessively large purchase transactions were made from recipient accounts.

### III

The issue in this review is whether, through a preponderance of evidence, it is more likely true than not true that the questionable transactions were the result of trafficking.

## IV

The Compliance Center has presented a prima facie case that Mr. Grocery's likely trafficked with regards to SNAP benefits. Examples of trafficking transactions will be displayed from the Charge letter attachments dated August 19, 2011 as shown below:

**Attachment 1:**   Multiple withdrawals were made from an individual benefit accounts within unusually short time frames:

It is documented, in the Charge letter dated August 19, 2011, that there were 76 transactions in sets of purchases from individual benefit accounts in unusually short time periods from approximately one minute to 24 hours.

As previously stated above, the Compliance Center documents in their record that they conducted an interview on September 9, 2011 with Appellant and his accountant. Appellant stated it appears the times reflected are not the purchase times. Instead these dates and times are actually when the SNAP Offline Vouchers are cleared through the authorization system for payment. However, all vouchers written for the day are cleared and processed at the end of each day.

Moreover, in correspondence received from Appellant on November 29, 2011, was additional information pertaining to the transaction noted in Attachment 1. Appellant performed a sampling of five households to reconcile with on their firm's authorization sheets. Of the five, only one actually had two separate vouchers processed on the same day though from two different drivers. Appellant contends that, with the remaining four households, only one of the transactions, previously mentioned in Attachment 1 of the Charge letter, was actually settled.

An example of such is as follows:

| Terminal | Date | Time | Household | Amount | Method |
|----------|------|------|-----------|--------|--------|
| T0000002 | 04/09/2011 | 01:56:16 PM | *****5255 | $190.00 | Voucher |
| T0000002 | 04/09/2011 | 02:38:37 PM | *****5255 | $218.00 | Voucher |
| *Total Violations: 2* | | *Total Time:* | *42 min 21 sec* | *Amount:*   $408.00 | |

Appellant contends that, per their firm's "Authorization Sheet" dated April 9, 2011, only the $190.00 transaction actually cleared and not the $218.00 transaction, as highlighted above. However, further verification was performed to confirm that the $218.00 did, in fact, clear as noted in Attachment 1. Moreover, it was verified with the FNS Retailer Operations Branch that only voucher cleared transactions are populated for these Attachments.

Therefore, while Appellant's explanation of the back-to-back transactions being reflective of the voucher cleared time is accurate the contention that only one of the transactions in the sets actually clearing is incorrect and without merit.

As such, while it can be accepted the times noted for the transactions in the Attachments are the voucher cleared times and not the times of purchase, the Compliance Center does document the occurrences of multiple transactions conducted by the same households on the same day, with two examples shown below:

| Terminal | Date | Time | Household | Amount | Method |
|----------|------|------|-----------|--------|--------|
| T0000002 | 04/13/2011 | 11:42:11 AM | *****9578 | $700.00 | Voucher |
| T0000002 | 04/13/2011 | 11:46:08 AM | *****9578 | $504.00 | Voucher |
| **Total Violations: 2** | | **Total Time:** | **3 min 57 sec** | **Amount:** | **$1,204.00** |
| | | | | | |
| T0000002 | 04/12/2011 | 12:12:48 PM | *****6447 | $225.00 | Voucher |
| T0000002 | 04/12/2011 | 12:38:31 PM | *****6447 | $639.00 | Voucher |
| **Total Violations: 2** | | **Total Time:** | **25 min 43 sec** | **Amount:** | **$864.00** |

Appellant has not offered any explanation or justification for multiple orders placed and cleared during the same business day.   Moreover, Appellant has not offered any explanation for households, such was Household *****6447, as highlighted above, that have access to and regularly shop at full-line superstores and supermarkets, yet spend such seemingly irregular and inexplicably high amounts at a rolling retailer such as Mr. Grocery's.

As displayed below, the Compliance Center documents in their record that Household *****6447 conducted a transaction in the amount of $954.00 with Mr. Grocery's while only spending a total of $164.28 on five separate trips to superstores:

| store_id | store_name | xtn_datetime | store_type | household | amount |
|----------|------------|--------------|------------|-----------|--------|
| 179969 | Mr. Grocery's | 6/13/2011 1:12 pm | DR | ****6447 | $954.00 |
| ***** | Minyard Food Store | 6/12/2011 2:18 pm | SS | ****6447 | $26.50 |
| ***** | Minyard Food Store | 6/12/2011 2:19 pm | SS | ****6447 | $11.29 |
| ***** | Minyard Food Store | 6/14/2011 3:43 pm | SS | ****6447 | $43.87 |
| ***** | Minyard Food Store | 6/14/2011 3:45 pm | SS | ****6447 | $21.68 |
| ***** | WAL-MART 2667 | 6/16/2011 1:22 pm | SS | ****6447 | $60.94 |

In addition, the Compliance Center record contains the menu and prices for the items available for purchase with Mr. Grocery's, as well as, a cost comparative analysis of Mr. Grocery's to Costco as displayed below reflecting a markup of about 100%:

| Product | Costco | Mr. Grocery |
|---------|--------|-------------|
| 6 lb frozen lasagna | $9.98 | $20.00 |
| Frozen chimichangas (18 ct.) | $11.98 | $22.00 |
| Frozen pizza (12 ct.) | $10.98 | $20.00 |
| Pancake sausage/stick (18 ct.) | $8.98 | $17.00 |
| Croissants (3.3 lbs/12ct.) | $10.68 | $20.00 |
| Owens Sausage/Biscuit (24 ct.) | $9.33 | $16.00 |
| Vienna Sausage (18 ct.) | $7.34 | $16.00 |
| Ramen Noodles (34 ct.) | $6.48 | $12.00 |

Given Household *****6447 had access to and shopped at full-line superstores there would not appear to be any legitimate basis for their aforementioned transactions conducted at Mr. Grocery's. Moreover, when reviewing the menu of Mr. Grocery's, it does not offer for sale the following:

- Any fruits or vegetables (fresh or frozen);
- Any fresh bread or whole grain products (frozen loaves of bread are offered for $7.00 each and cereal for $13.00 a box);
- Dairy: limited to only milk for $6.00; and
- Meat/fish/poultry: limited to frozen products only.

Given the focus of the stock is mainly on frozen and snack foods, with very limited perishables and staple foods, it would appear difficult for a family to do their monthly shopping solely at Mr. Grocery's. While Appellant's explanations, through counsel, may be valid for some of the transactions that have occurred with the firm, they do not provided the needed clarity to justify those displayed above as examples for Household *****6447.

Moreover, there does not appear to be any legitimate basis of attraction for a household to shop with a delivery service like Mr. Grocery's, when they are already shopping at major superstores where the pricing is considerably less and the selection greater. Therefore, Appellants' explanations, through counsel, do not constitute valid grounds for the elimination of the current charges of violations or for mitigating the impact of those charges. Rather, transactions such as those shown above conducted at Mr. Grocery's are indicative of trafficking.

**Attachment 2**: The majority or all of the individual recipient benefits were exhausted in unusually short periods of time: The letter of charges, dated August 19, 2011, details a listing of 173 transactions in purchases totaling in the range of $100.00 to $1,052.00.

In correspondence received from Appellant on November 29, 2011, Appellant stated they have drivers with seven years experience. As such, they know what the customers buy and supply their needs accordingly. However, when a driver arrives to deliver the order, there are times where the customer may not have exactly enough in their SNAP account to cover the purchases and the total is, at times, discounted. Also, there are customers that are unable to travel for shopping.

With regard to these explanations, it can be accepted that there may be households that do have transportation constraints and therefore rely on food delivery businesses such as Mr. Grocery's. However, that was not the case for Household *****6447 discussed above for Attachment 1 or for Household *****9170 displayed below:

| Terminal | Date | Time | Household | Amount | Method | End Balance |
|----------|------|------|-----------|--------|--------|-------------|
| T0000002 | 05/02/2011 | 12:48:39 PM | *****6630 | $1,052.00 | Voucher | $0.00 |
| *Total Violations: 1* | *Total Time:* | *0 min 0 sec* | | *Amount:* | | *$1,052.00* |

Household *****6330, as highlighted above, exhausted their balance of $1,052.00 on May 2, 2011 with Mr. Grocery's. However, the Compliance Center documents this household has access to and regularly shopped at full-line superstores and supermarkets in April 2011. As displayed below, the Compliance Center documents in their record that Household *****6330 conducted a transaction in the amount of $908.00 with Mr. Grocery's while only spending a total of $93.58 on two separate trips to superstores prior to the transaction with Mr. Grocery's:

| store_id | store_name | xtn_datetime | store_type | household | amount |
|----------|-----------|--------------|------------|-----------|--------|
| ***** | Foodland Markets 51 | 4/1/2011 6:25 pm | SS | *****6630 | $63.19 |
| ***** | El Rio Grande Supermercado #77 | 4/2/2011 12:43 pm | SS | *****6630 | $60.39 |
| 179969 | Mr. Grocery's | 4/4/2011 9:02 am | DR | *****6630 | $908.00 |

As previously stated, Appellant has not offered any valid explanations for why a household would shop with Mr. Grocery's while also shopping at major full-lined superstores. Again, this behavior is especially irregular as Mr. Grocery's includes a very substantial mark-up on the items for purchase and delivery.

Moreover, a recent USDA report, dated February 2011, stated that more than half of the SNAP recipients redeem all or nearly all of their benefits in the first two weeks after issuance. This recent study updated a prior USDA report on SNAP shopping patterns[1] which indicated that after the first day of benefit issuance, on average, 80 percent of a household's allotment remains unspent. Even after seven days, 40 percent of benefits still remain unspent. It takes two weeks to deplete 80 percent of one's benefits, and three weeks to deplete 90 percent. This recent USDA report validated the prior study released in 2005 based on 2003 Fiscal Year data.

As such, depleting a large portion of one's SNAP balance very early in the benefit month, thereby leaving little or no benefits for the rest of the month is inconsistent with the normal shopping behavior of SNAP benefit households. Given this information, many of the transactions noted in Attachment #2, conducted with Mr. Grocery's, are inconsistent with these studies on SNAP shopping patterns as they deplete their balances much sooner than the study documented through their findings. As such, transactions of this nature are often reflective of trafficking and not legitimate purchases of SNAP eligible food, despite the contentions offered by Appellant, through counsel.

As a result of the households sampled by the Compliance Center, which demonstrate them shopping at full-line supermarkets and superstores, there simply is no legitimate basis for such attraction to Mr. Grocery's. Combined with the substantial price mark-up, there is no great price advantage nor is there a profusion of ethnic goods or specials offered with Mr. Grocery's, aside from home delivery. The merchandise offered by Mr. Grocery's are available to customers at other retail food stores which carry a wider variety of staple food stock; more competitive pricing; and have fresh meats; fresh produce; dairy and bread/grain items available.

---

[1] *Analysis of EBT Benefit Redemption Patterns: Methods for Obtaining, Preparing, and Analyzing the Data.* Report prepared by Abt Associates for the Food and Nutrition Service, USDA, November 2005.

Therefore, as Appellant, through counsel, has not offered any valid explanations for the transactions noted in this particular attachment there are no valid grounds for the elimination of the current charges of violations or for mitigating the impact of those charges. Rather, as already noted, transactions such as those shown above conducted at Mr. Grocery's are indicative of trafficking.

**Attachment 3**:  Excessively large purchase transactions were made from recipient accounts: The letter of charges, dated August 19, 2011, details a listing of 232 transactions ranging from $398.00 to $1,502.00.  Shown below are the transactions conducted by Household ****1361that exceeded $1,000.00:

| Terminal | Date | Time | Household | Amount | Method |
|---|---|---|---|---|---|
| T0000002 | 05/03/2011 | 09:57:34 AM | *****1361 | $1,502.00 | Voucher |
| T0000002 | 06/03/2011 | 09:45:26 AM | *****1361 | $1,380.00 | Voucher |
| T0000002 | 04/04/2011 | 01:12:24 PM | *****1361 | $1,359.00 | Voucher |
| T0000001 | 02/03/2011 | 12:14:39 PM | *****1361 | $1,055.00 | Voucher |
| T0000001 | 03/03/2011 | 05:01:17 PM | *****1361 | $1,035.00 | Voucher |

As previously stated above, the Compliance Center documents in their record that they conducted an interview on September 9, 2011 with Appellant and his accountant.  Appellant stated the transactions are not unusually excessive for large families.

Moreover, in correspondence received from Appellant on November 29, 2011, was additional information pertaining to the transaction noted in Attachment 3.  Appellant stated they have some customers where Mr. Grocery is their sole supply of food as they are not able to travel.  Also, as the food is delivered to their home it provides them with more independence.

However, the Compliance Center documents in their record that Household *****1361, noted above,  for the month of February 2011, had access to and regularly shopped at full-line supermarkets and superstores yet spending inexplicably more with Mr. Grocery's as shown on the chart below:

| store_id | store_name | xtn_datetime | store_type | household | amount |
|---|---|---|---|---|---|
| 179969 | Mr. Grocery's | 2/3/2011 12:14 pm | DR | *****1361 | $1,055.00 |
| ***** | Super Plaza 06 | 2/3/2011 7:55 pm | SS | *****1361 | $27.54 |
| ***** | Super Plaza 06 | 2/4/2011 4:03 pm | SS | *****1361 | $8.17 |
| ***** | Super Plaza 06 | 2/5/2011 10:49 am | SS | *****1361 | $37.97 |
| ***** | HEB 064 | 2/6/2011 4:06 pm | SM | *****1361 | $93.07 |
| ***** | Super Plaza 06 | 2/6/2011 7:59 pm | SS | *****1361 | $16.01 |
| ***** | Super Plaza 06 | 2/8/2011 4:03 pm | SS | *****1361 | $89.51 |
| ***** | Super Plaza 06 | 2/8/2011 4:04 pm | SS | *****1361 | $9.19 |
| ***** | Super Plaza 06 | 2/11/2011 6:17 pm | SS | *****1361 | $19.45 |
| ***** | Super Plaza 06 | 2/11/2011 6:18 pm | SS | *****1361 | $8.16 |

As previously stated, it can be accepted that there may be households that do have transportation constraints and therefore rely on food delivery businesses such as Mr. Grocery's. However, that was not the situation with Household *****1361, shown above.

Moreover, Household *****2404, also exhibited in Attachment 3 for excessively large purchases conducted at Mr. Grocery's, also displayed the same pattern of unusual, irregular, and inexplicable SNAP activity as the prior households noted, as shown below:

| store_id | store_name | xtn_datetime | store_type | household | amount |
|---|---|---|---|---|---|
| ***** | WAL-MART # 1279 | 7/7/2011 5:39 am | SS | *****2404 | $2.76 |
| 179969 | Mr. Grocery's | 7/7/2011 9:00 am | DR | *****2404 | $1,107.00 |
| ***** | KROGER 107 | 7/7/2011 12:10 pm | SS | *****2404 | $66.92 |
| ***** | KROGER 107 | 7/10/2011 9:30 pm | SS | *****2404 | $18.30 |
| ***** | KROGER 107 | 7/11/2011 8:29 pm | SS | *****2404 | $2.00 |

As shown above, Household *****2404 shopped at both Wal-Mart and Kroger spending only $69.68 in total yet $1,107.00 with Mr. Grocery's on the same day. As previously stated, Appellant has not offered any valid explanations for why a household would shop with Mr. Grocery's while also shopping at major full-lined superstores.

Moreover, the Compliance Center prepared comparative analysis with Mr. Grocery's to other mobile route businesses with the following results for the same review period of February through July 2011:

| Store ID | Store Name | Store Type | State | Total Trans Count | Total Trans Amount | Average Trans Amount |
|---|---|---|---|---|---|---|
| 0179969 | Mr. Grocery's | DR | TX | 4,929 | $969,960 | $196.79 |
| ***** | ***** | DR | TX | 796 | $52,306 | $65.71 |
| ***** | ***** | DR | TX | 460 | $27,727 | $60.28 |
| ***** | ***** | DR | TX | 321 | $18,780 | $58.50 |
| ***** | ***** | DR | TX | 779 | $47,911 | $61.50 |

The Compliance Center documents in their record that the average SNAP transaction for the other comparable route retailers was $61.50, with the range from $58.50 to $65.71. However, based on the statistics above, for the review period of February through July 2011, the average SNAP EBT transaction with Mr. Grocery's was $196.79 or more than ***triple*** that of the other comparable route averages.

Lastly, the Compliance Center analyzed the SNAP redemptions and IRS tax returns for 2010, which were presented by Appellant, through an accountant, at the interview conducted on September 9, 2011. The following results are documented in the Compliance Center record. As noted on the table below, there appears to be an issue with regard to the sales reporting for 2010, per the IRS Form 1065:

## Tax Comparison & Analysis

| Tax Year | Gross Income Reported | SNAP Redemptions | $ Difference |
|----------|----------------------|------------------|--------------|
| 2010 | $534,221.00 | $548,198.85 | -$13,977.85 |

Noting the table above, the total SNAP EBT benefits redeemed with Mr. Grocery's in 2010 *exceeded* the total gross sales reported to the IRS by nearly $14,000.00. The Compliance Center record does not have any information from Appellant regarding this seemingly inexplicable sales reporting incongruence. Moreover, when factoring sales paid with cash and credit/debit cards, the disparity between SNAP redemptions and the "Gross Income Reported" would be even wider.

In summary, there has been nothing presented by Appellant to clarify or provide justification to the aforementioned analysis. In addition, the incongruent sales information is indicative of trafficking. Moreover, as previously stated, there does not appear to be any legitimate basis of attraction for a household to shop with a delivery service like Mr. Grocery's when they are already shopping at major superstores where the pricing is less; the selection is greater and where they offer fresh meats; more dairy products and have fresh produce and grains. Therefore, Appellants' explanations, through counsel, do not constitute valid grounds for the elimination of the current charges of violations or for mitigating the impact of those charges.

**V**

In the appeal request letter received on November 29, 2011, with subsequent correspondence received on January 9, 2012, Appellant, through counsel, appealed the Compliance Center's permanent disqualification determination offering the following contentions:

- As Appellant did not sufficiently submit documentation to validate the transactions noted in the Charge letter dated August 19, 2011, the following information was provided for consideration with the administrative review:
  1. Photographs of the warehouse and trucks;
- **Attachment 1**: Multiple withdrawals were made from an individual benefit account within unusually short time frames:
  1. Appellant performed a sampling of five households to reconcile with on their firm's authorization sheets. Of the five, only one actually had two separate vouchers processed on the same day though from two different drivers. Appellant contends that, with the remaining four households, only one of the transactions previously mentioned in Attachment 1 of the Charge letter was actually settled;
  2. However, if there are any occasions where the SNAP recipient believes the incorrect amount was processed from their account they will contact the "Help Desk". If it is determined that the firm is at fault they will issue a credit to the SNAP account;
- **Attachment 2**: The majority or all of the individual recipient benefits were exhausted in unusually short periods of time:
  1. They have drivers with seven years experience. As such, they know what the customers buy and supply their needs;

2. However, when a driver arrives to deliver the order, there are times where the customer may not have exactly enough in their SNAP account to cover the purchases and the total is discounted;

- **Attachment 3**: Excessively large purchase transactions were made from recipient accounts:

    1. They have some customers where Mr. Grocery is their sole supply of food as they are not able to travel. Also, as the food is delivered to their home it provides them with more independence.

Moreover, in correspondence received from Appellant, through counsel, on January 9, 2012, were the following additional contentions and submittals:

- 24 sets of alleged SNAP recipient order forms and respective vouchers;
- No evidence has been presented to demonstrate that the firm has participated in trafficking;
- Although the Compliance Center has not cited any particular incidents in which Appellant has trafficked they seem to imply guilt based on the escalation of sales. It was explained during the interview conducted by the Compliance Center on September 9, 2011 that increase in monthly SNAP redemptions from $50,000.00 to $250,000.00 was due to the hiring of experience salesmen who had previously developed routes for other mobile food grocers. Moreover, Appellant acquired six new trucks to accommodate the newly hired route drivers;
- There is a "checks-and-balance" system that requires the inventory and sales are in-line with each other therefore preventing trafficking from occurring. For example, a driver is provided with a certain amount of inventory and, at the end of the day, the sales and inventory much match. Also, the vouchers are processed in a central location;
- The vast majority of the low income areas that the customers live do not have "conventional" grocery stores in the vicinity. As such, the mobile grocery stores thrive; and
- Appellant is pleased to be SNAP authorized and requests reconsideration of the determination by the Compliance Center.

The preceding may represent only a brief summary of Appellants' contentions presented in this matter. Please be assured, however, in reaching a decision, full attention was given to all contentions presented, including any not specifically recapitulated or specifically referenced herein.

## VI

Appellants' contentions, through counsel, addressing issues specific to the Charge letter Attachments have already been covered in the prior sections above. As previously discussed, Appellants' explanations, through counsel, were not sufficient to provide the clarity or justification needed to validate the transactions or to constitute valid grounds for the dismissal of the current charges of violations or for mitigating the impact of those charges.

Appellant, through counsel, contends that no evidence has been presented to demonstrate that the firm has participated in trafficking. With regard to this contention, the Compliance Center has presented a prima facie case that Mr. Grocery's likely trafficked in SNAP benefits as evidenced by:

- The suspicious patterns in EBT transaction data;
- The alleged inaccuracies regarding the reported gross sales relating to the IRS federal tax filings for 2010;
- The comparable SNAP redemption analysis of other delivery route retailers; and
- The sampling of households that reflect they are also shopping at full-line supermarkets and superstores spending considerably less than at Mr. Grocery's.

Moreover, it should be noted at this time, that the Food and Nutrition Service employs a computerized fraud detection tool to identify EBT transactions that form patterns having characteristics indicative of trafficking. This tool does not determine or conclude that trafficking has occurred. The Compliance Center must still analyze the transaction data and patterns, often with other factors such as, in this case, an analysis of customer shopping behavior and a comparison of stores in the area, and render a determination whether the questionable transactions were, more likely than not, the result of trafficking.

As previously stated, 7 CFR § 278.6(a) states, *inter alia*, FNS may disqualify any authorized retail food store ... if the firm fails to comply with the Food and Nutrition Act of 2008, as amended, or this part. Such disqualification shall result from a finding of a violation on the basis of evidence that may include facts established through inconsistent redemption data, evidence obtained through a transaction report under an *electronic benefit transfer system* and on-site investigations .... (Emphasis added.)

Therefore, the SNAP regulations are very specific with regard to the action that must be taken regarding trafficking. As previously stated, 7 CFR §278.6(e) (1) reads, in part, "FNS shall disqualify a firm permanently if personnel of the firm have trafficked as defined in §271.2." Trafficking is defined, in part, in 7 CFR §271.2, as "the buying or selling of SNAP benefits for cash or consideration other than eligible food."

## CONCLUSION

The Compliance Center's analysis of Appellant's EBT transaction record was the basis for the Compliance Center's determination to disqualify Mr. Grocery's permanently. This information provided substantial evidence that the questionable transactions during the focus period had characteristics that are consistent with trafficking in SNAP benefits.

Therefore, based on a review of the evidence in this case, it is more likely true than not true that program violations did, in fact, occur as charged and that the Compliance Center has provided substantial evidence of trafficking violations. Based on the discussion above, the determination to impose a permanent disqualification against Mr. Grocery's is sustained.

## RIGHTS AND REMEDIES

In accordance with the Food & Nutrition Act of 2008, and the regulations thereunder, this penalty shall become effective thirty (30) days after receipt of this letter.

Your attention is called to Section 14 of the Food and Nutrition Act of 2008 (7 U.S.C. 2023) and to Section 279.7 of the Regulations (7 CFR § 279.7) with respect to your right to a judicial review of this determination. Please note that if a judicial review is desired, the Complaint, naming the United States as the defendant, must be filed in the U.S. District Court for the district in which you reside or are engaged in business, or in any court of record of the State having competent jurisdiction. If any Complaint is filed, it must be filed within thirty (30) days of receipt of this Decision.

Under the Freedom of Information Act (FOIA), it may be necessary to release this document and related correspondence and records upon request. If we receive such a request, we will seek to protect, to the extent provided by law, personal information that if released, could constitute an unwarranted invasion of privacy.

January 12, 2012

_____           _____
DOUGLAS G. PERRY                                        DATE
ADMINISTRATIVE REVIEW OFFICER